UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                         )
CHRISTIAN ROSADO,                        )
                                         )
        Petitioner,                      )
                                         )
        v.                               )   Case No. 3:14-cv-30150-TSH
                                         )
MICHAEL A. THOMPSON,                     )
                                         )
        Respondent.                      )
_____)


REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS CORPUS

On August 15, 2014, Christian Rosado ("Petitioner"), who is currently serving a sentence

in a Massachusetts correctional facility, petitioned this court for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996

(AEDPA) ("the Petition") (Dkt. No. 1).  Michael A. Thompson ("Respondent") opposes the

Petition (Dkt. No. 35).

Rosado was convicted of two counts of armed assault with intent to murder, one count of

carrying a firearm without a license, and one count of possessing a firearm without a firearm

identification ("F.I.D.") card.  In the Petition, Petitioner argues that he was deprived of his rights

as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution

by: (1) Ground One – the Commonwealth's failure to disclose a third-party statement in its

possession indicating that another individual had claimed responsibility for the shootings in

question; (2) Ground Four – trial counsel's ineffective assistance in failing to ensure that

Petitioner understood a plea agreement offered by the Commonwealth, to use available

impeachment evidence, to pursue the testimony of one of the victims who refused to testify on Fifth Amendment grounds notwithstanding a grant of immunity, and to object to the prosecutor's closing argument; (3) Ground Five – the prosecutor's vouching for the credibility of witnesses and arguing facts not in evidence in her closing argument; (4) Ground Seven – the bias the trial judge exhibited against Petitioner and his counsel during the trial; and (5) Ground Eight – the cumulative effect of these errors (Dkt No. 6).[1]  For the reasons set forth below, I RECOMMEND that the Petition be DENIED.

I.        BACKGROUND

A.  Facts[2]

In the early morning hours of Saturday, February 25, 2006, at a crowded "after-hours" house party at 111 Revere Street in Springfield, Massachusetts, brothers Luis Adorno ("Luis") and Hector Adorno ("Hector"), along with Hector Colon ("Colon") were shot (Dkt. No. 29 at 847-48).  At trial, three people who were present at the party – Carmelo Serrano ("Serrano"), Jolanda Rodriguez ("Rodriguez"), and Jasmine Milner ("Milner") – identified Petitioner as the shooter.

Serrano knew Petitioner personally, having spent 6 months with him in the same unit of the Hampden County House of Corrections the previous year (*id*. at 841-43).  Serrano testified that he saw Petitioner shoot Hector in the front room of the house shortly after Petitioner arrived

---

[1] The Petition set forth nine grounds for habeas relief, but the court dismissed Grounds Two, Three, Six and Nine in its Memorandum and Order on Respondent's Motion to Dismiss (Dkt. No. 24).

[2] As neither the trial court nor the MAC made specific findings of fact regarding the offense conduct, the following facts have been taken from the trial transcript.  *See Nock v. Roden*, No. 10-10158-RGS, 2011 WL 679845, at *3 n.5 (D. Mass. Jan. 31, 2011) (citing *Jackson v. Thompson*, No. 06-10066-RGS, 2007 U.S. Dist. LEXIS 19740, at *1 n.1 (D. Mass. Jan. 3, 2007)).

at the party (*id*. at 889).  Petitioner was wearing dark clothing and had his hair pulled back in a

ponytail (*id*. at 867, 883).  Petitioner's first shot missed Hector, but the second hit Hector in the

abdomen (*id*. at 860).  Petitioner shot Luis in the neck as Luis approached to see what was

happening with his brother (*id*. at 862).  Serrano did not see Colon get shot, but Colon was

standing next to Serrano when Petitioner started shooting (*id*. at 859-860).  Serrano testified that

Hector also had a gun that night and struggled to pull it out of his belt after Petitioner shot him

(*id*. at 889).  After the shooting, Serrano observed Petitioner back out of the front room into the

hallway leading to the front door and run down Revere Street toward Grand Street (*id*. at 867).

Two men who had stood blocking the door while Petitioner was shooting ran off with him (*id*. at

866-67).  Hector left through the back door (*id*. at 864, 868).  Serrano called 911 to report the

shooting and to get help for Luis, who lay on the floor in a pool of blood (*id*. at 864, 867).

Serrano drove by Petitioner later on the day of the shooting, at which time Petitioner lifted his

shirt, revealing a gun tucked into his waistband (*id*. at 869-870).  The following Monday,

February 27, 2006, the Springfield police took Serrano to the station, and he provided a

statement identifying Petitioner as the shooter (*id*. at 875, 881).  The police showed Serrano eight

photographs, including one of Petitioner (*id*. at 881).  According to Serrano, Petitioner's

appearance in the photograph was not the same as his appearance on February 25, 2006, but

Serrano recognized Petitioner from having been incarcerated with him and knew him to be the

shooter (*id*. at 881-82).  Serrano testified that he had received threats in connection with his

identification of Petitioner (*id*. at 915-16, 919-920).

Rodriguez lived in the house where the party was taking place and was hosting it (*id*. at

927-29).  She did not know Petitioner, but she observed him when he, along with two men who

arrived with him, pushed past her through the front door into the house (*id*. at 931-32).  All three

3

were wearing black hoodies with the hoods up, though Petitioner's hood came off at some point (*id*. at 932-33).  Rodriguez was standing right next to Luis when she observed Petitioner shoot him (*id*. at 934).  Rodriguez immediately turned to go get help, but was hit on the back of the head and lost consciousness (*id*. at 935).  After regaining consciousness, Rodriguez called 911 and described the assailants as three guys in black hoods – one Spanish with his hair in a ponytail and the other two appearing to be African American (*id*. at 935-37).  Springfield police interviewed Rodriguez in the hours following the incident, and she identified a picture of an African American male, who she believed was one of the hooded men that had accompanied Petitioner (*id*. at 938-39).  On March 1, 2006, the police showed Rodriguez approximately 200 pictures, and she identified a picture of Petitioner as the shooter (*id*. at 941-42).  Rodriguez testified that she also had been threatened as a result of her identification of Petitioner (*id*. at 944-45).

Milner likewise did not know Petitioner, but she testified that she observed Petitioner when he bumped into her twice after he entered the house, and she was standing right next to Petitioner when he pulled out his weapon and started shooting (*id*. at 1266).  On February 27, 2006, the Springfield police interviewed Milner and presented her with eight photographs for identification; she identified a picture of Petitioner as the shooter (*id*. at 1272-73, 1279-80).

Angie Bahamundi, a friend of Milner's, testified that she was standing with Milner in the front room when she observed a Puerto Rican or light-skinned black male with a large gap between his teeth and wearing a black hoodie or jacket bump into Milner on his way from the front hallway to the kitchen (*id*. at 1243-54, 1258-59).  After the man looked into the kitchen, he turned back into the front room and pulled a gun out of his jacket or pants (*id*.).  At that point, Bahamundi ran into and through the kitchen to a closet in a back room of the house, where she

hid until the shooting stopped (*id*.).  Bahamundi was unable to identify the shooter from the many pictures the Springfield police showed her (*id*. at 1256-57).

The defense sought to impeach the credibility of the three eyewitnesses who identified Petitioner.  The defense highlighted that Serrano did not identify Petitioner as the shooter until two days after the incident when he was taken to the police station, including in the 911 call that he made immediately following the incident, despite the fact that he considered Luis and Hector to be like family and knew Petitioner personally from their time together in jail; that Serrano was being held on bail and had been told that, following his testimony, he would be released on reduced bail; that Serrano had seven criminal convictions; and that Serrano had originally told the police that Hector did not have a gun that night in order to avoid getting Hector in trouble (*id*. at 838-39, 893-95, 898-99, 905-12).  The defense's proffered motive for Serrano to falsely implicate Petitioner was that Serrano wanted to date Petitioner's girlfriend, but she had declined to date him because of her relationship with Petitioner (*id*. at 895-98, 1315).  The defense impeached Rodriguez with her prior inconsistent statements to the police that the shooter was African American and had puffy hair (as opposed to hair pulled back into a ponytail) and that the African American male whose picture she selected on the day of the shooting was the shooter (as opposed to one of the men who accompanied the shooter) (*id*. at 951-55, 967, 1045).  The defense implied that Milner falsely identified Petitioner because she was friends with Serrano, and he told her to do it; Milner denied any such collusion, but she allowed that she may have asked Serrano who the shooter was before identifying Petitioner (*id*. at 1280-81).

The only victim to testify was Colon.  He testified that he did not see Petitioner in the front room where the shooting took place or anywhere at the party that night (*id*. at 1355-56, 1358).  The Commonwealth impeached Colon's testimony with his prior inconsistent statement

to the police in the hours after the shooting that he was playing pool and did not see the shooter (*id*. at 1357-62).  The Commonwealth implied that Petitioner had influenced Colon's testimony during the previous eight weeks, while the two were incarcerated together, including having been transported to the courthouse together that day (*id*.).

Luis and Hector's mother testified that the shooting had left Luis a quadriplegic, and he was hospitalized and unable to be in court (*id*. at 1297-98).  Hector indicated through counsel that he would refuse to testify if called, a grant of immunity notwithstanding, and neither side called him as a witness (*id*. at 716-17).  The immunity grant was based on his counsel's representations that, if questioned, Hector would have to acknowledge the possession and use of a firearm during the events in question (*id*. at 707).

The police recovered a .38 Smith & Wesson revolver in a vacant lot adjacent to 111 Revere St., which is separated from the residence by a sidewalk leading to its rear entrance (*id*. at 1065-66, 1166).  Inside the revolver were three live .38 caliber copper-jacketed bullets and three discharged cartridge casings, all of which were of the same manufacture and type (*id*. at 1076-78, 1168-71).  Inside the residence, the police recovered two spent projectiles with copper coverings consistent with the bullets in the revolver, and ballistics testing revealed that they had been fired from that weapon (*id*. at 1074-82, 1107, 1178-79).  A third projectile was lodged in a pocket door, and the police were unable to retrieve it (*id*. at 1086, 1109).  Finally, healthcare personnel removed a spent projectile from Hector that was the same caliber as those found at the crime scene, but it was not jacketed, and the rifling on it suggested that it came from a different gun than the one found in the vacant lot (*id*. at 1032-33, 1037, 1182-88).  Other spent projectiles and fragments remained in the victims' bodies, and the police were unable to test them.

The Commonwealth's theory regarding the ballistics evidence was that two guns were fired at the scene – one by Petitioner and one by Hector (*id*. at 1419, 1422-26).  The gun the police found in the vacant lot was the gun Serrano observed Hector trying to pull out of his belt after Petitioner shot him (*id*. at 1422, 1425-26).  Hector threw it into the lot as he exited from the rear of the house before going to obtain medical treatment for his gunshot wounds (*id*. at 1425-26).  Petitioner kept his gun, as evidenced by Petitioner flashing it at Serrano later on the day of the shootings (*id*. at 1425).

### B. Procedural History

On June 6, 2006, a Hampden County grand jury returned an indictment charging Petitioner with three counts of armed assault with intent to murder in violation of Mass. Gen. Laws ch. 265, § 18(b) relating to the shooting of Hector, Luis, and Colon, one count of carrying a firearm without a license in violation of Mass. Gen. Laws. ch. 269, § 10(a), and one count of possessing a firearm without an F.I.D. card in violation of Mass. Gen. Laws ch. 269, § 10(h) (Dkt. No. 29 at 101-07).  Following a five-day jury trial, on February 4, 2008, the jury found Petitioner guilty of all charges except for the count of armed assault with intent to murder Colon (*id*. at 4-5, 14-15, 1471-75).  Petitioner thereafter pleaded guilty to enhanced penalty portions of the indictment relating to the two firearms charges (*id*. at 15, 1494-95).  The court sentenced Petitioner to 15-20 years on each of the two armed assault with intent to murder charges, to be served consecutively, and, to be served concurrently with the first 15-20 year term, 5-10 years on the unlawful possession charge and 3-10 years on the ammunition charge (*id*. at 10, 1523-25).

Petitioner timely noticed an appeal from his convictions on October 28, 2008 (the "first appeal"), and, on March 3, 2009, the first appeal was stayed pending Petitioner's filing of a motion for new trial in Superior Court (*id*. at 16).  Petitioner filed a motion for new trial in

7

September 2009, based on the Commonwealth's failure to disclose an April 30, 2007 statement

made by a Jeremy Deane to the Springfield police in a separate investigation that someone else

had claimed responsibility for the shooting (the "Deane statement") (*id*. at 9, 11, 110-16).  The

pertinent portions of the Deane statement read as follows:

> I know that T-Cutter has shot someone before and a guy named
> Christian is sitting in jail right now for a shooting that T-Cutter
> did.  Christian used to live on Cedar Street in the same duplex that
> T-Cutter used to live in.  I know that T-Cutter did the shooting
> because he told me he did it.  I know T-Cutter has a 9 mm handgun
> black with a gray slide. ….  It was a square gun so it was probably
> a Glock. ….  I also seen T-Cutter with a Smith and Wesson .22 cal
> long barrel rifle hand gun. ….  He also had a black .38 caliber
> handgun, 6 shot, with a pin not a hammer. ….  The shooting that T-
> Cutter was talking about happened in the North End about a year
> ago.  It could have been on Massasoit Street I'm not really sure.
>
> ….
>
> Detective O'Shea showed me a single picture of a black male.  I
> identified the photo as T-Cutter.  I was told his real name is Tyrel
> Campbell.  I signed the photo and noted the date and the time.

(*id*. at 130).  Petitioner supported the motion for new trial with affidavits from his trial and

appellate attorneys and a private investigator who interviewed Deane on May 28, 2009 (*id*. at

120-32).  According to the defense investigator's affidavit:

> During the interview, Mr. Deane confirmed that he had made the
> statements attributed to him in the Springfield Police Report dated
> April 30, 2007 ….  He also confirmed that the statements were true
> and provided some additional details. … Mr. Deane did not know
> T Cutter's last name but his first name is Tyrel.  He described him
> as black and said he used to have an afro.  He also said that Tyrel
> had a noticeable gap between his two front teeth. … Mr. Deane
> explained that the gun Tyrel used in the shooting was one that the
> two of them had purchased together.  After the shooting in
> February, 2006, he no longer had that gun.

(*id*. at 132).  The Commonwealth filed an opposition supported by an affidavit of the trial

prosecutor (*id*. at 133-43).  The prosecutor averred that:

8

> Upon information and belief, Jeremy Deane clarified that T-Cutter was accompanied by, and standing with, Christian Rosado at the party where T-Cutter claimed he "shot a guy." …. Upon information and belief, Jeremy Deane has known T-Cutter and Christian Rosado since he was approximately twelve (12) years old. He "hung around" with the two males, and Jotsan Rosado (whom he knows as Christian Rosado's brother) every day, selling drugs at various locations, including 263 Central Street in Springfield. … Upon information and belief, Jeremey Deane will testify to "always hating" T-Cutter, but to being best friends with Christian Rosado, whom he describes as being "very smart."

(*id*. at 140). In its brief opposing Petitioner's motion for new trial, the Commonwealth represented that, "[i]n reinterviewing Deane, he denied the accuracy of [the defense investigator's] affidavit, as it purported to report Deane's statements to [the investigator]," but that representation does not appear in the prosecutor's affidavit (*id*. at 134). Petitioner filed an affidavit from Deane's attorney in rebuttal (*id*. at 151-52). Deane's attorney averred that he was present when the prosecutor and a Springfield police detective interviewed his client on or about December 23, 2009. He further stated:

> It is my recollection that Mr. Deane maintained that his original statement to the police was accurate and that Christian Rosado did not shoot anyone. Further, Mr. Deane stated to the ADA that "T-Cutter" admitted to him that he did the shooting. Mr. Deane did state that he did not buy the gun used with T-Cutter and said he was living out of state when the gun was purchased. I have spoken with Mr. Deane he [sic] has indicated that my recollection of the conversation is accurate.

(*id*.).

The trial judge denied the motion for new trial without a hearing. In doing so, she made the following findings:

> The Deane statement, taken on April 30, 2007, included the remark that "T-Cutter" had shot someone for which "a guy named Christian is sitting in jail right now." Neither the police nor prosecutors connected the statement to the subject shootings which occurred in February 2006. An investigator for the defendant

interviewed Deane in May, 2009.  Deane told the investigator that
"T-Cutter," a/k/a "Tyrel" made the statement quoted earlier and
also said that T-Cutter has a 9mm black handgun stored at a
particular home address in Springfield.  The Comm. reports that at
its request the police interviewed Deane who now claims T-Cutter
and the defendant were together at the party where the defendant
shot 2 individuals one of whom has been near death since the
shootings.  Deane also disclaims [the investigator's] reiteration of
Deane's purported statements to him.

(*id*. at 148-50).   Based on these findings, the trial judge held that:

It is unlikely that Deane's statements would be admissible at a new
trial.  They are self-contradictory & the latest statements made to
police essentially recant the statement the defense investigator
reports.  If the statements were to be admitted they hold little, if
any credibility, not only because they contradict one another and
do not cast real doubt on the justice of the conviction.  ….  There
was clear evidence by eyewitnesses to the shootings which erupted
when Mr. Rosado and others invaded a party.  It is highly unlikely
if not fanciful to believe that based on the evidence presented at
trial that the jury would reach a different conclusion than that
reached after a full trial with multiple witnesses and highly
relevant exhibits.  It was clear throughout the trial that many of the
witnesses were afraid to testify, but nonetheless rose to the
occasion.

(*id*.).

Petitioner appealed the denial of the motion for new trial, and that appeal was

consolidated with his direct appeal (*id*. at 17).  Petitioner argued that the judge erred in denying

his motion for new trial based on the Commonwealth's failure to produce the Deane statement,

which denied him "due process as guaranteed by the Fifth and Fourteenth Amendments to the

United States Constitution and Article XII of the Massachusetts Declaration of Rights" (*id*. at

58); erred in certain findings of fact related to the Deane statement that were not supported by

the record; and erred in permitting Serrano and Rodriguez to testify that they had been threatened

in connection with their statements against Petitioner (*id*. at 24-85).  In an opinion dated May 19,

2011, the Massachusetts Appeals Court ("MAC") affirmed Petitioner's convictions and the

denial of his motion for new trial. *Commonwealth v. Rosado*, 2011 WL 1888002, at *1 (Mass.

App. Ct. May 19, 2011) (hereinafter "*Rosado I*"). On the issues related to the Deane statement,

the MAC stated:

> We cannot say, on this record, that the judge abused her discretion
> by concluding that Deane's statements to the police and to a
> defense investigator were contradictory enough to render him not
> credible. Putting aside questions of whether the police should have
> connected the statement to this case and whether we view the
> evidence as exculpatory or newly discovered, we cannot conclude
> that the judge abused her discretion by determining that the
> statement would not have cast any real doubt on the validity of the
> convictions. Even assuming the statement was admissible, which
> is questionable as the judge determined, the eyewitness testimony
> identifying the defendant as the shooter, including from a witness
> who personally knew the defendant, was overwhelming. *See*
> *Commonwealth v. Lykus*, … [885 N.E.2d 769 (Mass.] 2008). In
> addition, if the jury had been aware of Deane's statement, it would
> have also learned that Deane hated T-Cutter and that the defendant
> was a lifelong friend. These facts would have established Deane's
> obvious bias as a witness.

*Id*. at *1 (footnotes omitted). The court addressed Petitioner's evidentiary challenges in

accompanying footnotes, observing that, "[t]he judge did not, and she was not required to, credit

the affidavit of Deane's attorney that averred that there was no recantation," and that it was not

an abuse of discretion for the judge to rely on the prosecutor's affidavit in finding that T-Cutter

and the defendant were together at the party on the night of the shooting and that Deane denied

or recanted his statement. *Id*. at *1 nn.2-3. The court found that the threat "evidence was

properly used to rehabilitate the witnesses' credibility, and the judge gave careful limiting

instructions to prevent any unfair prejudice to the defendant." *Id*. at *1.

On June 21, 2011, Petitioner filed an application for leave to obtain further appellate

review ("first ALOFAR"), seeking review only of his claim that the trial court erred in denying

his motion for new trial based on the Commonwealth's failure to produce the Deane statement

(Dkt. No. 29 at 22, 235-262).  The Massachusetts Supreme Judicial Court ("SJC") denied the first ALOFAR without opinion on July 28, 2011.  *Commonwealth v. Rosado*, 951 N.E.2d 350 (Table) (Mass. July 28, 2011).

On July 16, 2012, Petitioner, proceeding *pro se*, filed a second motion for new trial, asserting various claims of constitutional error during the trial and requesting an evidentiary hearing regarding a claim that the courtroom had been closed during jury selection (Dkt. No. 29 at 13, 356-57).  The trial judge denied the motion without hearing (*id*. at 352-54).  Petitioner sought reconsideration of the trial judge's decision, which was also denied (*id*. at 13).  Petitioner, still proceeding *pro se*, filed a timely notice of appeal seeking review of the denial of his second motion for new trial and the order denying reconsideration (the "second appeal").  The second appeal was entered on September 21, 2012 (*id*. at 20).  On December 21, 2012, Petitioner filed, through counsel, a motion to amend his *pro se* motion for new trial (*id*. at 14, 358-59).  The trial judge again denied Petitioner's motion, and that decision was consolidated with the already-pending second appeal in the MAC (*id*. at 14, 21, 375).

On his second appeal, Petitioner asserted several claims of constitutional error, including: ineffective assistance of trial counsel for the same reasons he presses in the Petition, i.e. trial counsel's failure to ensure that Petitioner understood a plea offer, to use available impeachment evidence, to pursue Hector's testimony, and to object to the prosecutor's closing argument; ineffective assistance of appellate counsel for the same reasons pressed in the Petition, i.e. appellate counsel's failure to raise in the first appeal claims for inadmissible threats evidence, prosecutorial misconduct, judicial bias, and ineffective assistance of trial counsel; violation of the right to a public trial during jury selection; and violations of due process and fair trial rights due to judicial bias, prosecutorial misconduct, and cumulative trial errors (*id*. at 263-320).

Petitioner also asked the MAC to reconsider its previous affirmance of the trial court's denial of the motion for new trial on the basis of the Deane statement in light of new precedent from the SJC and the Supreme Court (*id*. at 296-305). On April 29, 2014, the MAC affirmed all three trial court orders on Petitioner's second motion for new trial. *Commonwealth v. Rosado*, 2014 WL 1669985, at *1 (Mass. App. Ct. Apr. 29, 2014) (hereinafter "*Rosado II*"). The MAC determined that Petitioner had not met his burden of showing that a court room closure had occurred; declined to review Petitioner's claims for ineffective assistance of trial counsel, prosecutorial misconduct, and judicial bias because they were not raised at trial or in the first appeal or first motion for postconviction relief; and, applying the state standard for ineffective assistance set out in *Commonwealth v. Saferian*, 315 N.E.2d 878 (Mass. 1974), denied Petitioner's claim for ineffective assistance of appellate counsel. *Rosado II*, 2014 WL 1669985, at *2-3. On the issue of the Deane statement, the court stated:

> The defendant now cites two recent cases in support of his argument that we should reconsider this issue; both are easily distinguishable. In *Commonwealth v. Murray*, … [957 N.E.2d 1079 (Mass.] (2011), the Supreme Judicial Court held that the trial judge did not abuse her discretion in allowing the defendant's motion for a new trial, in light of newly discovered evidence, and reiterated the principle that there is to be "special deference to the action of a motion judge who was also the trial judge …, therefore, [there is] a discretionary range … within which the trial judge may properly award a new trial, even if a new trial is not constitutionally required and even if [the appellate court] would not have granted a new trial on [its] own assessment of the record." *Id*. at 21 (quotations and citations omitted). As noted, in this case, it was the trial judge who determined that "[i]t [was] highly unlikely if not fanciful to believe that based on the evidence presented at trial that the jury would reach a different conclusion." In *Smith v. Cain*, [565 U.S. 73 (2012),] unlike in the present case, the previously undisclosed evidence was both material and relevant. Therefore, even were we to reconsider our earlier holding in this case, we would come to the same conclusion.

*Id*. at *1-2 (footnote omitted).

13

Petitioner filed another ALOFAR in the SJC on May 19, 2014 (the "second ALOFAR"), raising the same claims made to the MAC on the second appeal (Dkt. No. 29 at 23, 611-43). The SJC denied the second ALOFAR without opinion on July 30, 2014. *Commonwealth v. Rosado*, 15 N.E.3d 761 (Table) (Mass. July 30, 2014).

II.    DISCUSSION

A.    Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). "A habeas petitioner must meet certain preliminary criteria before [a court] can reach the merits of his claim." *McCambridge v. Hall*, 303 F.3d 24, 34 (1st Cir. 2002). "He must have fairly presented his claims to the state courts and must have exhausted his state court remedies." *Id.* (citing 28 U.S.C. § 2254(b)(1)(A)). "Further, if the state decision rests on the adequate and independent state law ground of procedural default, then federal habeas review is unavailable absent a showing of cause and prejudice, or a showing that a miscarriage of justice will otherwise result." *Id.* (citing *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *Gunter v. Maloney*, 291 F.3d 74, 78 (1st Cir. 2002); *Burks v. Dubois*, 55 F.3d 712, 716 (1st Cir. 1995)).

If these threshold criteria are met, the level of review to which a petitioner is entitled depends on whether or not his claims were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). "A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'" *Junta v. Thompson*, 615 F.3d 67, 72 (1st Cir. 2010) (quoting *Teti v. Bender*, 507 F.3d 50, 56 (1st Cir.

2007)).  "'[A] state court decision that does not address the federal claim on the merits falls

beyond the ambit of the AEDPA,' *Clements v. Clarke*, 592 F.3d 45, 52 (1st Cir. 2010), and the

habeas court reviews such a claim *de novo*."  *Junta*, 615 F.3d at 71 (citing *Fortini v. Murphy*,

257 F.3d 39, 47 (1st Cir. 2001)).  In contrast, if the state court has "adjudicated [the claim] on the

merits," a federal habeas court may not grant relief unless the adjudication of the claim:

> (1)  resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

28 U.S.C. § 2254(d).  *See also Junta*, 615 F.3d at 71.  A legal principle is "clearly established"

within the meaning of subparagraph (d)(1) "only when it is embodied in a holding of th[e]

[Supreme] Court."  *Thaler v. Haynes*, 559 U.S. 43, 47 (2010) (citing *Carey v. Musladin*, 549

U.S. 70, 74 (2006); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  "Section 2254(d) reflects the

view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice

systems,' not a substitute for ordinary error correction through appeal."  *Harrington*, 562 U.S. at

102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in

judgment)).  Authority to issue the writ is limited to "cases where there is no possibility

fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme]

Court's precedents."  *Id*. at 102.  Further, in conducting its review, the federal habeas court must

presume correct the factual determinations made by state courts, unless the habeas petitioner can

meet "the burden of rebutting the presumption of correctness by clear and convincing evidence."

*See* 28 U.S.C. §2254(e)(1); *see also Clements*, 592 F.3d at 47.  Section 2254(e)(1)'s

"'presumption of correctness is equally applicable when a state appellate court, as opposed to a

state trial court, makes the finding of fact.'"  *Teti*, 507 F.3d at 58 (quoting *Norton v. Spencer*, 351

F.3d 1, 6 (1st Cir. 2003)).  With these principles in mind, the court turns to Petitioner's claims.

      B.   Petitioner's Claims

          1.   Ground One – The Deane Statement

Petitioner argues that he was deprived of his rights to due process and a fair trial as

guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution

when the Commonwealth withheld the Deane statement.  *Brady v. Maryland*, 373 U.S. 83

(1963), sets forth the clearly established law governing the mandatory disclosure of exculpatory

evidence.

          a.   Preliminary Issues

The parties do not dispute that Petitioner fairly presented his *Brady* claim and exhausted

his state court remedies as required by 28 U.S.C. § 2254(b)(1)(A).  The parties disagree,

however, about what standard of review should apply.  Petitioner asserts that he is entitled to *de

novo* review of his *Brady* claim because it was not "adjudicated on the merits" in state court,

while Respondent argues that the claim should be reviewed pursuant to 28 U.S.C. § 2254(d).

Thus, the court must determine whether the MAC adjudicated Petitioner's *Brady* claim on the

merits within the meaning of the AEPDA.[3]  In making this determination, "the federal habeas

court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits,"

even where "a state court issues an order that summarily rejects without discussion *all* the

defendant's claims raised by a defendant," or "addresses some of the claims raised by a

---

[3] The SJC denied Petitioner's first and second ALOFARs, and, thus, the court "'look[s] through
to the last reasoned decision' to determine the basis for the state court's holding."  *Junta*, 615
F.3d at 71 (quoting *Malone v. Clarke*, 536 F.3d 54, 63 n.6 (1st Cir. 2008)).

defendant but not a claim that is later raised in a federal habeas proceeding." *Johnson v. Williams*, 133 S. Ct. 1088, 1091 (2013).

"There are three components to a *Brady* claim: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Healy v. Spencer*, 453 F.3d 21, 25 (1st Cir. 2006) (quoting *Strickler*, 527 U.S. at 281-82). "Prejudice exists only if there is a 'reasonable probability of a different result' had the evidence been disclosed." *Id.* (quoting *Banks v. Dretke*, 540 U.S. 668, 699 (2004)). "'Reasonable probability' denotes a probability sufficient to 'undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). However, "prejudice under *Brady* should not be equated with a sufficiency of the evidence standard, *Kyles*, 514 U.S. at 434-35, nor does it 'mean that the reviewing court must be certain that a different result would obtain,' *United States v. Dumas*, 207 F.3d 11, 15 (1st Cir. 2000)." *McCambridge*, 303 F.3d at 37. *Commonwealth v. Tucceri*, 589 N.E.2d 1216 (Mass. 1992), is the parallel Massachusetts authority on failure to produce exculpatory evidence. *Tucceri* consists of the same three components as *Brady*, but explicitly articulates "a state law standard that is 'more favorable to defendants [on the prejudice prong] than the Federal Constitutional standard.'" *McCambridge*, 303 F.3d at 35 (quoting *Tucceri*, 589 N.E.2d at 1223 n.11).

The First Circuit has "recognized that adjudication of a constitutional claim on its merits encompasses situations in which a petitioner's claim was resolved under a state standard 'that is more favorable to defendants than the federal standard.'" *Zuluaga v. Spencer*, 585 F.3d 27, 30 (1st Cir. 2009) (referring to the rule as the "*McCambridge* rule") (quoting *McCambridge*, 303 F.3d at 35). *See also Johnson*, 133 S. Ct. at 1096 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002))

("[I]f the state-law rule subsumes the federal standard – that is, if it is at least as protective as the federal standard – then the federal claim may be regarded as having been adjudicated on the merits."). The First Circuit has applied the *McCambridge* rule to *Brady* claims by habeas petitioners that Massachusetts courts have resolved under the more favorable *Tucceri* prejudice standard. *See Zuluaga*, 585 F.3d at 30-31; *Healy*, 453 F.3d at 25-26; *Norton*, 351 F.3d at 5; *McCambridge*, 303 F.3d at 35.

Here, not only has Petitioner not overcome the presumption that the MAC adjudicated his *Brady* claim on the merits, *Johnson*, 133 S. Ct. at 1091, but also the *McCambridge* rule applies because the MAC resolved the claim under the more favorable *Tucceri* prejudice standard. In *Rosado I*, there was no dispute that the Commonwealth had not produced the Deane statement to Petitioner, and the MAC set aside the question of whether the Deane statement was exculpatory. *Id.*, 2011 WL 1888002, at *1. The MAC resolved the claim on the third prong of the analysis, concluding that, even assuming the admissibility of the Deane statement, Petitioner had not shown prejudice. That the MAC was applying the more defendant-friendly *Tucceri* prejudice standard is revealed by its citation to *Commonwealth v. Lykus*, 885 N.E.2d 769 (Mass. 2008), a case in which the SJC reversed the trial court's granting of the defendant's motion for new trial because the defendant had not met his burden of showing prejudice under *Tucceri*. In *Rosado II*, Petitioner asked the MAC to reconsider its earlier ruling based on new authority from the SJC in *Murray*, 957 N.E.2d at 1079, and the Supreme Court in *Smith*, 565 U.S. at 73, both of which were resolved on the prejudice prong of the analysis. The MAC discussed each case, found that both were "easily distinguished," and declined to reconsider its earlier ruling that Petitioner had not shown prejudice. *Rosado II*, 2014 WL 1669985, at *1-2. Thus, because the MAC addressed

Petitioner's *Brady* claim on the merits, § 2254(d) applies to the MAC's determination that Petitioner was not prejudiced by the prosecution's failure to disclose the Deane statement.

Petitioner next argues that he has rebutted § 2254(e)(1)'s presumption of correctness as to state court determinations of factual issues.  According to Petitioner, the clear and convincing evidence rebutting the presumption can be found in the "affidavits filed with the trial court, and the trial court's failure to conduct an evidentiary hearing to flesh out any credibility issues" (Dkt. No. 32 at 11).  As observed by the district court in its Memorandum and Order on Respondent's motion to dismiss, "the presumption of correctness cannot be overcome where a petitioner merely presents the same evidence to the federal habeas court as was considered by the state courts" (Dkt. No. 24 at 12 (citing *Teti*, 507 F.3d at 59)).  That is precisely what Petitioner has done here.  Moreover, Petitioner's argument that clear and convincing evidence can be found in the trial court's failure to conduct an evidentiary hearing is illogical, and there is no requirement that a state court provide a hearing before § 2254(e)(1) deference applies.  *Teti*, 507 F.3d at 59. Therefore, under these circumstances, Petitioner has failed to overcome the presumption of correctness.

b.  <u>AEDPA Review</u>[4]

(i)  *Contrary to or an Unreasonable Application of Clearly Established Federal Law*

"Under the 'contrary to' clause [of 28 U.S.C. § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme]

---

[4] Petitioner does not even advance the argument that he should prevail under AEDPA deference, instead arguing only that he prevails on *de novo* review.  The court has determined that Petitioner is not entitled to *de novo* review, but, nevertheless, proceeds with a 28 U.S.C. § 2254(d) review.

Court has on a set of materially indistinguishable facts." *Smith v. Dickhaut*, 836 F.3d 97, 100

(1st Cir. 2016) (second and third alterations in original) (quoting *Williams*, 529 U.S. at 412-13).

There is no valid argument that the MAC's decisions in *Rosado I* and *Rosado II* are "contrary to"

clearly established federal law.  The MAC applied the proper rule of law by asking if the

Petitioner was prejudiced by the nondisclosure of the Deane statement.  *See Strickler*, 527 U.S. at

281-82.  Moreover, Petitioner does not identify, and the court is not aware of, any Supreme

Court case reaching a different result on materially indistinguishable facts.

Thus, "the debate centers on whether the [MAC's] determination was an 'unreasonable

application' of the federal rule on prejudice to the facts of the case here."  *McCambridge*, 303

F.3d at 36.  "Under the 'unreasonable application' clause, a federal habeas court may grant the

writ if the state court identifies the correct governing legal principle from the [Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Smith*, 836

F.3d at 100 (alteration in original) (quoting *Williams*, 529 U.S. at 412-13).  An "incorrect"

application of federal law is not necessarily an "unreasonable" one.  *Id.*

> [T]he most important point is that an *unreasonable* application of
> federal law is different from an *incorrect* application of federal law
> ….  Under § 2254(d)(1)'s "unreasonable application" clause, then,
> a federal habeas court may not issue the writ simply because that
> court concludes in its independent judgment that the relevant state-
> court decision applied clearly established federal law erroneously
> or incorrectly.  Rather that application must also be unreasonable.

*Id.* (quoting *Williams*, 529 U.S. at 410-11).

> It is not always clear when a decision is an unreasonable
> application of federal law.  "If it is a close question whether the
> state decision is in error, then the state decision cannot be an
> unreasonable application."  *McCambridge*, 303 F.3d at 36.  An
> unreasonable application exists, however, when there "is some
> increment of incorrectness beyond error."  *Id.* (citation omitted).
> "The increment need not necessarily be great, but it must be great

> enough to make the decision unreasonable in the independent and
> objective judgement of the federal court."  *Id.*

*Norton*, 351 F.3d at 8.  "So, to prevail, a state habeas petitioner must demonstrate that 'the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Id.* (quoting *Harrington*, 562 U.S. at 103).  "[S]o long as 'fairminded jurists could disagree'" about whether the state court's decision was correct, habeas relief is unavailable.  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The MAC based its finding that Petitioner had failed to demonstrate prejudice from the non-disclosure of the Deane statement on the strength of the eyewitness testimony identifying Petitioner as the shooter, which it characterized as "overwhelming," combined with Deane's significant credibility problems.  *Rosado I*, 2011 WL 1888002, at *1.  This was not an unreasonable application of *Brady*.  As the First Circuit has stated, "there is no prejudice under *Brady* and so no due process violation unless there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *McCambridge*, 303 F.3d at 37 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (plurality opinion)).  "This has been referred to as the *Brady* prejudice or materiality standard; without it, there is no *Brady* violation.  *Id.* (citing *Strickler*, 527 U.S. at 281-82).  The materiality of a failure to disclose favorable evidence "must be evaluated in the context of the entire record."  *United States v. Agurs*, 427 U.S. 97, 112 (1976).  Thus, the MAC properly recognized the strength of the case against Petitioner based on the testimony from three eyewitnesses, including Serrano, who knew Petitioner personally from their time together in jail, identifying Petitioner as the shooter.  *See, e.g., DeCologero v. United States*, 802 F.3d 155, 165 (1st Cir. 2015) (including

"the strength of the trial evidence against [the defendant]" as a factor in determining that there was no *Brady* prejudice).  The trial judge, to whom the MAC granted special deference, found the eyewitness testimony to be credible, and her observation that "many of the witnesses were afraid to testify, but nonetheless rose to the occasion," bolstered her assessment (Dkt. No. 29 at p. 149-150).[5]  The MAC also properly recognized Deane's credibility issues due to his "statement to the police and to a defense investigator [being] contradictory enough to render him not credible," and his "obvious bias as a witness," insofar as "Deane hated T-Cutter and … [Petitioner] was a lifelong friend."  *Rosado I*, 2011 WL 1888002, at *1.  Accordingly, it was not unreasonable for the MAC to conclude in *Rosado I* that, even if Petitioner had received the requested information, there was no "reasonable probability that … the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682.  Nor was it unreasonable for the MAC to refuse to reconsider its reasonable holding on the lack of *Brady* prejudice in *Rosado II*.

*ii.*     *Unreasonable Determination of the Facts*

The second prong of § 2254(d)(2) is satisfied if the state court judgment is based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has not resolved the question of how § 2254(d)(2) and § 2254(e)(1)'s presumption of correctness fit together.  *Wood v. Allen*, 558 U.S. 290, 300 (2010) ("[W]e find once more that we need not reach th[e] question [of how §§ 2254(d)(2) and (e)(1) fit together], because our view of the reasonableness of the state court's

---

[5] The trial judge did not state explicitly that she found the eyewitnesses to be credible, but she did so implicitly in her comment on their courage in testifying despite their fear of reprisal and her forceful denial of Petitioner's motion for new trial:  "It is highly unlikely if not fanciful to believe that based on the evidence presented at trial that the jury would reach a different conclusion than that reached after a full trial with multiple witnesses and highly relevant exhibits" (*id.*).

factual determination in this case does not turn on any interpretive difference regarding the relationship between these provisions."). *See also Smith*, 836 F.3d at 101 (noting the Supreme Court's silence on how §§ 2254(d)(2) and (e)(1) fit together; *Teti*, 507 F.3d at 57-58 ("This question [of how §§ 2254(d)(2) and (e)(1) fit together] has not been definitively resolved [by the Supreme Court,] nor do we attempt our own resolution here.").  In the breach, the First Circuit "has routinely held petitioners to the § 2254(e)(1) 'clear and convincing' standard without reference to § 2254(d)(2)," the latter of "which is less deferential to state court findings of fact," although it has acknowledged that it has done so only in cases where "resolving the fit between the two sections would appear to have made [no] difference."  *Smith*, 836 F.3d at 101 (citations omitted).  The First Circuit has explained that it is "follow[ing] the Supreme Court's lead … [by] apply[ing] § 2254(e)(1) to the [state court's] individual factfindings," *Teti*, 507 F.3d at 58, insofar as the Supreme Court has "suggested that § 2254(e)(1) applies to 'determinations of factual issues, rather than decisions,' while § 2254(d)(2) 'applies to the granting of habeas relief' itself."  *Id*. at 57-58 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 341-42 (2003)).  "That is, under this approach, § 2254(d)(2)'s reasonableness standard would apply to the final decision reached by the state court on a determinative factual question, while § 2254(e)(1)'s presumption of correctness would apply to the individual factfindings, which might underlie the state court's final decision or which might be determinative of new legal issues considered by the habeas court."  *Id*. at 58 (citations omitted).

Here, the court has already discussed why Petitioner fails to overcome § 2254(e)'s presumption of correctness, and Petitioner does not argue that the MAC made an unreasonable determination of the facts in light of the evidence presented.  However, erring on the side of caution, the court proceeds with a § 2254(d)(2) analysis.  Again, the MAC based its conclusion

that Petitioner was not prejudiced by the non-disclosure of the Deane statement on the strength of the eyewitness testimony identifying Petitioner as the shooter and the significant credibility issues with the Deane Statement.  Petitioner disputes the strength of the eyewitness testimony against him, but the trial judge found the eyewitnesses to be credible, and the MAC deferred to her credibility assessments.  "[T]he state trial judge's implicit credibility determinations, adopted by the MAC, are exactly the type of factual determinations to which [a habeas court] defer[s], at least short of any indication of serious error."  *Teti*, 507 F.3d at 59 (citing *Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.")).  Petitioner has not shown any indication of such serious error here, and, thus, the MAC reasonably determined that the eyewitness testimony was credible.

The MAC's assessment of Deane's credibility based on his "obvious bias" and "contradictory enough statements to the police and to a defense investigator" are also reasonable in light of the evidence.  The prosecutor averred that Deane would testify to "always hating" T-Cutter, but being "best friends" with Petitioner (Dkt. No. 29 at 140).  Deane's attorney, who averred that he was present when the prosecutor spoke to his client, did not refute these representations (*id*. at 151-52).  The record also reveals contradictions in Deane's statements.  Deane told the defense investigator in May 2009 that "the gun Tyrel used in the shooting was one that the two of them had purchased together" (Dkt. No. 29 at 132).  Deane did not disclose this information in his statement to the police in April 2007, and in his December 2009 interview with the police and the prosecutor, he stated that, not only did he not buy the gun with T-Cutter, but also that he was living out of state when the gun was purchased (*id*. at 152).  Additionally, in his initial statement to the police in April 2007, Deane stated that "a guy named Christian is

24

sitting in jail right now for a shooting that T-Cutter did" (*id*. at 129). Deane did not say anything about T-Cutter being at the party with Petitioner or disclose that the "guy named Christian" was his "best friend."

Petitioner's primary complaint is with the MAC's affirming of the trial court's finding that Deane denied or recanted his April 2007 statement. The MAC concluded that "[i]t was not an abuse of discretion or error for the judge to rely on the prosecutor's affidavit in support of th[is] fact[ ]." *Rosado I*, 2011 WL 1888002, at *1 n.3. As set forth above, the prosecutor did not make this representation in her affidavit, but rather, it appears only in the Commonwealth's brief opposing Petitioner's motion for new trial. As such, the specific finding that Deane denied or recanted his initial statement to the police is at least arguably unreasonable based on the evidence presented. Nonetheless, the *Brady* prejudice evaluation occurs within "the context of the entire record." *Agurs*, 427 U.S. at 112. Even setting aside as unreasonable the particular finding that Deane denied or recanted his initial statement, the MAC's assessment of the strength of the eyewitness testimony against Petitioner and Deane's significant credibility issues based on the inconsistencies in his statements and his obvious bias remain reasonable determinations of the facts in light of the evidence presented, and they support the reasonableness of the MAC's finding of no *Brady*/*Tucceri* prejudice.

Accordingly, the MAC's adjudication of Petitioner's *Brady* claim in *Rosado I* and *Rosado II* survives AEDPA review, and Petitioner is not entitled to a writ of habeas corpus on Ground One of the Petition.

### 2. Grounds Four, Five, and Seven – The Procedurally Defaulted Claims

Petitioner claims that his Fifth, Sixth, and Fourteenth Amendment rights were violated due to the ineffective assistance of his trial counsel (Ground Four), prosecutorial misconduct

during closing argument (Ground Five), and judicial bias of the trial court (Ground Seven).  The

presiding District Judge has held that these claims are procedurally defaulted (Dkt. No. 24 at 6).

"'[I]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to

an independent and adequate state procedural rule, federal habeas review of the claims is

barred.'"  *Obershaw v. Lanman*, 453 F.3d 56, 67-68 (1st Cir. 2006) (quoting *Coleman v.

Thompson*, 501 U.S. 722, 750 (1991)).  "The default may be excused, and the bar to federal

habeas review removed, only in certain circumstances: where 'the prisoner can demonstrate

cause for the default and actual prejudice as a result of the alleged violation of federal law, or

demonstrate that failure to consider the claims will result in a fundamental miscarriage of

justice.'"  *Id*. at 68 (quoting *Coleman*, 501 U.S. at 750).

### a.  Cause and Prejudice

"The procedural default doctrine and its attendant 'cause and prejudice' standard are

'grounded in concerns of comity and federalism,' *Coleman*, 501 U.S. at 730, and apply alike

whether the default in question occurred at trial, on appeal, or on state collateral attack, *Murray

v. Carrier*, 477 U.S. 478, 490-92 (1986)."  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

"[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting

his federal claims has deprived the state courts of an opportunity to address those claims in the

first instance."  *Coleman*, 501 U.S. at 732.  Therefore, before the federal habeas court will

consider the merits of the procedurally defaulted claim, the petitioner must demonstrate cause for

the default and prejudice therefrom.  *Edwards*, 529 U.S. at 451.

"In the habeas context, cause is a term of art.  To excuse a procedural default, a

petitioner's cause must relate to an objective factor, external to the defense, that thwarted (or at

least substantially obstructed) the efforts of the defendant or his counsel to obey the state's

procedural rule." *Burks*, 55 F.3d at 716–17 (citing *Murray,* 477 U.S. at 488; *Magee v. Harshbarger,* 16 F.3d 469, 471 (1st Cir.1994)). "One way to establish cause is to demonstrate that defense counsel's inaction constituted ineffective assistance of counsel." *Horton v. Allen*, 370 F.3d 75, 81 (1st Cir. 2004) (citing *Coleman*, 501 U.S. at 752; *Carrier*, 477 U.S. at 488; *Gunter*; 291 F.3d at 81). "Mere attorney error, not amounting to ineffective assistance in a constitutionally significant sense, *see, e.g., Scarpa v. Dubois,* 38 F.3d 1 (1st Cir.1994), *cert. denied,* 513 U.S. 1129, (1995) *and additional petition for cert. filed* (U.S. Oct. 27, 1994) (No. 94-9157), is insufficient to constitute cause." *Burks*, 55 F.3d 717 (footnote omitted) (citing *Coleman,* 501 U.S. at 753; *Murray,* 477 U.S. at 488; *Puleio v. Vose*, 830 F.2d 1197, 1201 (1st Cir. 1987)). Thus, to establish legally cognizable cause sufficient to excuse a procedural default, a petitioner must meet the familiar test elucidated in *Strickland v. Washington*, 466 U.S. 668 (1984), and "show both that counsel's performance was deficient and that it prejudiced his defense."[6] *Janofsky v. St. Amand*, 594 F.3d 39, 45 (1st Cir. 2010) (citing *Strickland*, 466 U.S. at 687).

> To establish deficient performance, a defendant must show that, considering all the circumstances, "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To establish prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. at 694.

*Janofsky*, 594 F.3d at 45.

---

[6] Petitioner argues that the procedural default of his claims for prosecutorial misconduct and ineffective assistance of trial counsel should be excused because he has sufficiently "pled" or "alleged" that he was afforded ineffective assistance of both trial and appellate counsel (Dkt. No. 32 at 21-22, 28 n.14). Simply *pleading* or *alleging* ineffective assistance is, of course, insufficient to *establish* cause.

"Importantly, a federal habeas petitioner trying to excuse his procedural default by showing ineffective assistance of counsel as cause must first have presented the ineffective assistance claim to the state court." *Lynch v. Ficco*, 438 F.3d 35, 46 (1st Cir. 2006) (citing *Edwards*, 529 U.S. at 452-53; *Gunter*, 291 F.3d at 81). Thus, "a habeas petitioner can default on presenting an ineffective assistance claim even when the claim is offered as a reason to show cause and prejudice for his default on a different constitutional claim." *Id.* When this occurs, the petitioner nevertheless can still "try to show cause and prejudice to excuse the default of the ineffective assistance claim in order to show cause and prejudice to excuse his procedural default of the different constitutional claim he wants to present." *Id.* (citing *Edwards*, 529 U.S. at 453).

This is the situation here. Petitioner defaulted on presenting a claim for ineffective assistance of trial counsel by not raising it in his first motion for new trial or first appeal. Accordingly, to excuse the default in order to show cause to excuse the default of his claims for ineffective assistance of trial counsel, prosecutorial misconduct, and judicial bias, he must demonstrate that appellate counsel's failure to raise these claims constituted ineffective assistance. Petitioner raised a claim for ineffective assistance of appellate counsel in state court as required. The MAC applied the state standard for ineffective assistance set out in *Saferian*, 315 N.E.2d at 878, which the First Circuit has held "is the functional equivalent of the *Strickland* standard," *Lynch*, 438 F.3d at 48 (citing *Mello v. DiPaulo*, 295 F.3d 137, 143-44 (1st Cir. 2002); *Scarpa*, 38 F.3d at 7), and found no ineffective assistance. *Rosado II*, 2014 WL 1669985, at *2-3. The MAC determined that each of the grounds that appellate counsel failed to raise was futile and concluded that, "'because the decision not to advance a losing argument does not fall measurably below that which might be expected from an ordinary fallible lawyer, and because the defendant was not deprived of an otherwise available, substantial ground of defence by virtue

28

of his counsel's decision not to advance' the arguments the defendant now asserts on appeal, we are satisfied that the defendant was not deprived of effective assistance in his direct appeal." *Id*. at *3 (quoting *Commonwealth v. Butler*, 985 N.E.2d 377, 388 (Mass. 2013)).

"There is disagreement among courts about whether, when the state court has decided a direct ineffective assistance claim [as the MAC has here], that decision is entitled to AEDPA deference in the cause-and-prejudice context or whether the ineffective assistance claim is reviewed *de novo* as to cause and prejudice." *Janosky*, 594 F.3d at 44-45 (string citation with parentheticals comparing the holdings of different federal courts on the issue omitted). "The First Circuit has not yet ruled on whether the *Strickland* inquiry, when nested within the cause-and-prejudice analysis, is limited by the deferential standard of review set forth in the [AEDPA] ...." *Id*. at 44. To the extent that it is, the presiding District Judge has already determined, in dismissing Petitioner's stand-alone claim for ineffective assistance of appellate counsel, that the MAC's decision survives AEDPA review (Dkt. No. 24 at 13-15). This court will follow the lead of the First Circuit in *Janosky*, however, and assume without deciding that *de novo* review applies. *Id*. at 45. "[E]ven under that more favorable standard, the [P]etitioner fails to demonstrate ineffective assistance of [appellate] counsel as cause for his procedural default[s]." *Id*.

To show that appellate counsel's performance was objectively unreasonable under *Strickland*, Petitioner must overcome the "strong presumption that ... the challenged action might be considered sound ... strategy." *Tejeda v. Dubois*, 142 F.3d 18, 22 (1st Cir. 1998) (quoting *Strickland*, 466 U.S. at 689). Petitioner cannot overcome this presumption as to any of the claimed errors. As the presiding District Judge observed in his Memorandum and Order on Respondent's Motion to Dismiss, "[t]here can be no serious contention that [appellate] counsel's

omission of the[ ] already waived claims was a mistake and not a strategic decision" (Dkt. No. 24 at 15) (citing *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S. Ct. 1 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."); *Vieux v. Pepe*, 184 F.3d 59, 64 (1st Cir. 1999) (observing that counsel's performance cannot be deficient where an attorney declines to pursue a futile tactic). *See also Smith v. Murray*, 477 U.S. 527, 535-36 (1986) (remarking that the "process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy"); *Jewett v. Brady*, 634 F.3d 67, 77 (1st Cir. 2011) (quoting *Strickland*, 466 U.S. at 689) ("Counsel's choice to focus an appellate brief on the strongest claims, omitting weak claims, 'might be considered sound strategy.'"). Because Petitioner has failed to demonstrate ineffective assistance of appellate counsel, he has not established cause for the procedural default of his claims for ineffective assistance of trial counsel, prosecutorial misconduct, or judicial bias.

### b.  Actual Innocence

"[T]he fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, th[e] Court explicitly tied the miscarriage of justice exception to the petitioner's innocence." *Id*. at 321. *See also Walker v. Russo,* 506 F.3d 19, 21 (1st Cir. 2007) (citing *Murray,* 477 U.S. at 496 ("The Supreme Court has emphasized that the actual innocence exception is very narrow, reserved for truly exceptional

cases."). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006) (quoting *Schlup,* 513 U.S. at 327). *See also Gunter,* 291 F.3d at 83. "The meaning of actual innocence … does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty" beyond a reasonable doubt. *Schlup*, 513 U.S. at 329. "[A] petitioner does not meet this threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* "Further, 'actual innocence' requires the petitioner to show 'factual innocence, not mere legal insufficiency.'" *Barreto-Barreto v. U.S.*, 551 F.3d 95, 102 (1st Cir. 2008) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). "In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Schlup*, 513 U.S. at 327-28. Indeed, "the habeas court must consider 'all of the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327-28).

Petitioner does not meet the heavy burden of showing actual innocence. As observed by the MAC, the eyewitness testimony against Petitioner was "overwhelming." *Rosado I*, 2011 WL 1888002, at *1. Three witnesses identified Petitioner as the shooter. One of those witnesses, Serrano, personally knew Petitioner from their time together in jail. Petitioner characterizes the

eyewitness testimony as "flawed," (Dkt. No. 38 at p. 2), but he brought out the supposed flaws before the jury.  Petitioner sought to impeach the testimony of each eyewitness – Serrano based on his delay in identifying Petitioner, his interest in Petitioner's girlfriend, his expectation that he would be released on reduced bail following his testimony, his lengthy criminal record, and his initial lie to the police that Hector did not have a gun (*id*. at 838-39, 893-99, 905-12, 1315); Rodriguez based on her hosting an illegal house party and her prior inconsistent statements to the police that the shooter was African American and had puffy hair and that the African American male whose picture she selected on the day of the shooting was the shooter (*id*. at 953-55, 967, 1045); and Milner based on the implication that she had identified Petitioner only because Serrano told her to do so (*id*. at 1280-81).  Notwithstanding Petitioner's efforts, as recognized by Petitioner, "[t]he jury decided the credibility contest in favor of the Commonwealth" (Dkt. No. 32 at p. 5).  Moreover, the trial judge who observed the demeanor of the eyewitnesses while testifying also found them to be credible, and this court does not revisit those credibility determinations.

Deane, on the other hand, would not be a credible witness.  His statements contain a number of inconsistencies.  Deane failed to tell the police in his initial statement that, not only did he know the "Christian" who was "sitting in jail … for a shooting T-Cutter did," but also, that Christian was his "best friend."  Nor did Deane did tell the police that Christian and T-Cutter were together at the party where the shooting occurred.  Finally, Deane told the defense investigator that he and T-Cutter together purchased the gun T-Cutter used in the shooting, but he later retracted that statement when speaking to the police and prosecutor.  At that time, he claimed that he did not buy the gun with T-Cutter and was living out of state when it was

purchased.  In addition to these inconsistencies, Deane has an obvious bias toward Petitioner, whom he characterized as his "best friend," and against T-Cutter, whom he "always hat[ed]."

Deane's statements, riddled as they are with bias and inconsistencies, when considered against the positive identifications made by Serrano, Rodriquez, and Milner, fail to constitute a sufficiently persuasive showing of actual innocence.  The court is not persuaded that, in light of the Deane statement, "no juror, acting reasonably, would have voted to find [Petitioner] guilty beyond a reasonable doubt."  *Schlup*, 513 U.S. at 329.  Accordingly, Petitioner has failed to meet his heavy burden of showing actual innocence as a gateway to his defaulted claims.

Therefore, Petitioner has not excused the default of his federal claims, and habeas review is barred as to Grounds Four, Five, and Seven of the Petition.

### 3.   Ground Eight - Cumulative Error

Petitioner's final claim is that the combination of individual errors denied him a fair trial. While it is true that "individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect," *United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993), that is inapposite here.  None of Petitioner's individual claims is meritorious, and a claim based on cumulative error is likewise unavailing.  *See Williams v. Drake*, 146 F.3d 44, 49 (1st Cir. 1998) (stating that, "[a]bsent any particularized error, there can be no cumulative error").

### III.   RECOMMENDATION

For the foregoing reasons, I RECOMMEND that the Court DISMISS Grounds One, Four, Five, Seven, and Eight of the Petition and DENY Petitioner Christian Rosado's Petition for Writ of Habeas Corpus .[7]

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED:  June 22, 2017

---

[7] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within fourteen (14) days of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.